The opinion previously issued in this case is withdrawn and the following substituted therefor.
The appellant, Terry Bland, was convicted of murder, a violation of § 13A-6-2, Code of Alabama 1975. Pursuant to the Habitual Felony Offender Act, he was sentenced to life imprisonment without parole.
The appellant presents five issues on appeal.
 I
Initially, the appellant contends that the guilty verdict was palpably contrary to the great weight of the evidence.
The state's evidence tended to show that at 10:43 a.m. on August 7, 1990, the appellant, a white male, telephoned 911 and stated that he had found his mother's body in their home on Rush Drive in Montgomery. The first Montgomery Police Department officer on the scene entered the house and found the victim, Jewel Bland, lying on a mattress in the den and covered by a quilt from the waist up. Firemedics pronounced the victim dead at the scene. The cause of death was later determined to be five stab wounds to the chest, three of which penetrated the left lung and heart. When the body was found, it was in full post-mortem rigor, which indicated that the time of death was between noon on August 5 and noon on August 6.
Corporal J.T. Hunt of the Montgomery Police Department testified that someone had attempted to make the victim's house appear as if it had been broken into. A screen on a window in the den had been torn off and the glass had been broken, yet items on the windowsill were undisturbed, the blinds were still down, dust on the inside of the blinds was unmarred, cobwebs remained across the sill, and fragments of glass that had scattered across the room lay on top of the quilt that covered the corpse. Further, nothing appeared to have been stolen and only two rooms in the house had been disturbed: the victim's and the appellant's. Hunt stated that, even though items were strewn across both rooms, it was obvious that the items had been carefully placed because not a single fragile object had been broken. In the victim's room, a cedar chest had been broken into, apparently with a ball-peen hammer that was found lying on the ground nearby. Two human hairs consistent with those of black persons were found at the scene (one on the victim's body, one on the sill of the broken window), but Hunt testified that these probably came from one of the firemedics, who was black.
At the scene, the appellant told the police that he and his girlfriend, Debbie Huebner, had been at her trailer in Hope Hull before coming to the victim's house and discovering the body. On August 14, the appellant, after being advised of his rights under Miranda v. Arizona,[1] stated that he had been with Huebner at her house trailer from approximately 3:30 p.m. on August 5 until around 10:15 a.m. on August 7, except for around 11:00 a.m. on August 6, when they briefly returned to his house to get his mail. At that time, though, the appellant *Page 523 
did not enter the house and did not see the victim. The victim was last seen alive at 10:00 p.m. on August 5 by a neighbor. The appellant and Huebner discovered the victim's body at approximately 10:30 a.m. on August 7.
During his statement on August 14, the appellant indicated that he had his mother's maroon pick-up truck during the time he was away from the house from August 5 through 7. A neighbor, however, stated that she saw the pick-up in the victim's driveway at 5:45 p.m. on August 6, when the appellant was supposedly at Huebner's trailer.
Thereafter, the appellant recited different versions of the matricide; attributing the murdering of his mother to accident, drugs, other people, or to the devil.
Some time after August 14, Huebner drove the appellant to Mississippi. Upon returning to Montgomery on October 23, the appellant was picked up at the bus station by Ricky Glenn, a friend. While riding with Glenn, the appellant said that he had killed his mother when she accidentally "run into the knife" during an argument (R. 299). When Glenn suggested that he turn himself in, the appellant told him to drive to the police station. At the station, the appellant telephoned Corporal Hunt, who told him that they could not talk over the telephone. The appellant said that "he felt all along that [Hunt] knew that he had done it" (R. 141) and told Hunt that he would call him the next day.
On the morning of the 24th, the appellant again telephoned Hunt and asked him to pick him up. After meeting the appellant and driving him to the police station, Hunt advised him of hisMiranda rights, and the appellant signed a waiver form. In a videotaped statement, the appellant confessed to killing his mother during an argument. He stated that he had been standing in her bedroom door with a knife in his hand when she came toward him and that "the next thing he knew . . . the knife was stuck in her" (R. 143). After making the statement, the appellant was placed under arrest.
On October 28, the appellant, again after being advised of his rights, stated that he had the knife because he had wanted to run someone off who was in the driveway. When asked about the four other stab wounds, the appellant stated that he "must have gone berserk" (R. 160). Following his arrest, the appellant admitted to one of his brothers that he had killed their mother because he was "fixing to be busted for drugs" (R. 286).
On November 4, the appellant, after his rights were read to him, made a written statement in which he again admitted to killing his mother. This time, however, he stated that he had taken some sort of pills (two Xanax and one Flexeril) on the evening of August 5 and that, during the night, he and Huebner had gone to his house. The appellant could not recall, however, how they had gotten there. He also indicated that he could only remember segments of the time before and after he stabbed his mother, but that he did recall holding the knife and ordering a man to leave the house. The appellant also remembered arguing with his mother about her having a man over and about Huebner staying at the house. He also vaguely remembered driving back to Huebner's trailer after the stabbing.
The appellant included with his written statement a drawing of the knife that killed the victim. He labelled it as having a 5" blade and a 3"-4" handle. He also admitted to removing the screen from the den window and breaking into the chest with the ball-peen hammer. Additionally, the appellant sent a letter to a friend of the victim's that was similar to his November 4 statement.
On June 20, 1991, the appellant mailed a letter to one of his brothers in which he admitted to killing their mother because "Satan had come into my body and . . . took full control of me" and that "[t]he Lord had allowed it because someone was going to bring charges on me for the sale of dope" (R. 287). The appellant also wrote in the letter that God had told him what to do in dreams. He also wrote Ricky Glenn and *Page 524 
told him that he was going to hell for taking him to the police station.
The appellant contends on appeal that the guilty verdict was contrary to the great weight of the evidence. At trial, the appellant denied the truth of everything he said in the statements, explaining that he had only dreamed that he killed his mother. Further, he contends that there is no direct evidence placing him at the scene of the crime during the estimated time of death. Instead, the appellant argues that the evidence tends to show that the victim was killed by a perpetrator who had broken into the house or that, in the alternative, her death was the result of a conspiracy between his girlfriend and one of his brothers.
In support of his argument that the murder was committed by an intruder, the appellant points to the evidence that the house had been broken into. Further, he argues that the two negroid hairs found at the scene indicate that someone else besides he and his girlfriend had been in the house. He also contends that the window in the den was low enough so that someone could have stepped over the sill without disturbing the objects on it, that the blinds could not have been down because glass was found across the room, and that a pile of magazines below the window had been disturbed. Finally, he notes that prowlers had been seen around the appellant's house during the weeks prior to the murder.
In support of the conspiracy theory, the appellant testified at trial that Huebner, who could not be located to testify, and one of his brothers, Ronnie, were good friends and used to smoke marijuana together. He contends that there was a lot of "bad blood" between Huebner and his mother, and that Ronnie was extremely jealous of the appellant's close relationship with their mother. He suggests that the two must have drugged him, driven the maroon truck to his mother's house, and killed her while he was unconscious. The appellant also argues that, if he is convicted of his mother's death, Ronnie stands to inherit a part of the appellant's sizeable share of their mother's estate.
The "weight of the evidence" refers to " 'a determination [by] the trier of fact that a greater amount of credible evidence supports one side of an issue or cause than the other.' " Tibbs v. Florida, 457 U.S. 31, 37-38, 102 S.Ct. 2211,2216, 72 L.Ed.2d 652 (1982); R.B.N. v. State, 600 So.2d 409,410 (Ala.Cr.App. 1992); Johnson v. State, 555 So.2d 818, 820
(Ala.Cr.App. 1989). Conflicting evidence presents a jury issue.Curry v. State, 601 So.2d 157 (Ala.Cr.App. 1992); Smith v.State, 583 So.2d 990 (Ala.Cr.App.), writ denied, 583 So.2d 993
(Ala. 1991). In reviewing a verdict based largely on circumstantial evidence, we view the evidence in the light most favorable to the prosecution. Wilbourn v. State, 457 So.2d 1001
(Ala.Cr.App. 1984). Further, "it is not the province of this court to reweigh the evidence presented at trial." Watkins v.State, 565 So.2d 1227, 1231 (Ala.Cr.App. 1990).
Based on the facts as recited above, we conclude that the jury's verdict was not "palpably contrary to the great weight of the evidence and manifestly wrong." See Watkins, supra.
 II
The appellant also contends that the circuit court erred when it denied his motions for judgment of acquittal, contending that the state failed to establish the corpus delicti before his confessions were received into evidence.
"It has been the traditional and general rule that there must be independent proof of the corpus delicti in a criminal case before any confession . . . may be admitted in evidence against the accused." C. Gamble, McElroy's Alabama Evidence § 200.13 (4th ed. 1991) (footnote omitted). To establish the corpus delicti, the state must establish "(1) [t]hat a certain result has been produced . . .; and (2) that some person is criminally responsible for the act." McElroy's § 304.01. The corpus delicti may be established by circumstantial evidence. Marcusv. State, 568 So.2d 342 (Ala.Cr.App. 1990); Tice v.State, 386 So.2d 1180 (Ala.Cr.App.), writ denied, *Page 525 386 So.2d 1187 (Ala. 1980); McElroy's, § 304.01. Further, the perpetrator's identity is not required to establish the corpus delicti. Johnson v. State, 473 So.2d 607 (Ala.Cr.App. 1985);McElroy's § 304.01. See, e.g., Marcus, supra.
At trial, the firemedic who pronounced the victim dead at the scene and the medical examiner who performed the victim's autopsy and determined the cause of death to be five stab wounds to the chest had testified before the appellant's confessions were received into evidence. After reviewing the facts as recited above, we hold that there was sufficient evidence of the corpus delicti before the confessions were received into evidence. See, e.g., Marcus, supra. Further, even if the corpus delicti was not sufficiently established before the appellant's confession was received into evidence, "no reversible error exists because additional evidence of the corpus delicti was presented subsequent" to the admission of the confession. Marcus, 568 So.2d at 345. Thus, the circuit court did not err.
 III
The appellant further contends that the circuit court committed reversible error when it denied his motion to suppress the October 24 videotaped confession. The appellant argues that his statement was not voluntary because he was under the influence of drugs and religious matters.
"Before a confession can be received into evidence, the state must show that the appellant was read and understood hisMiranda rights and that the confession was voluntary." Williamsv. State, [Ms. 89-633, March 27, 1992], 1992 WL 92491, * 2 (Ala.Cr.App. 1992); Carpenter v. State, 581 So.2d 1277
(Ala.Cr.App. 1991). At the suppression hearing, the appellant stipulated that he had been lawfully advised of his Miranda
rights. Thus, our only consideration on appeal is whether his confession was voluntary.
In determining voluntariness, the court must look at whether the appellant "made an independent and informed choice of his own free will, that he possessed the capability to do so, and that his will was not overborne by pressures and circumstances swirling around him." Lewis v. State, 535 So.2d 228, 235
(Ala.Cr.App. 1988). See also Carpenter, 581 So.2d at 1278. The totality of the circumstances must be scrutinized in determining whether a statement was made voluntarily. Williams, supra. "The voluntariness of an alleged confession is a question for the trial court, and a trial judge's decision . . . will not be disturbed on appeal unless the decision is contrary to the great weight of the evidence and manifestly wrong." Henderson v. State, 583 So.2d 276, 296 (Ala.Cr.App. 1990), aff'd, 583 So.2d 305 (Ala. 1991), cert. denied, ___ U.S. ___, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992); Williams, 1992 WL 92491, * 3. See also, Hutchinson v. State, 516 So.2d 889
(Ala.Cr.App. 1987).
Here, Corporal Hunt, who was the only officer present when the appellant confessed, testified that the appellant contacted him on October 24 and asked to be taken to the police station. According to Hunt, the appellant was given no inducement to confess, he was willing to make the statement, and he was sober and coherent at the time he made the videotaped statement. Further, the videotape of the confession was shown at trial.
There is no evidence that the appellant made the statement involuntarily. See, e.g., Henderson, supra; Todd v. State,472 So.2d 707 (Ala.Cr.App. 1985). Thus, the circuit court did not err in denying the motion to suppress the confession.
 IV
Next, the appellant argues that the circuit court erred when it received evidence withheld by the prosecution and requested in his discovery motions, in violation of Rule 16 of the Alabama Rules of Criminal Procedure.[2] The appellant, however, *Page 526 
has failed to preserve this issue for review.
First, the only ruling that appears in the record regarding the appellant's discovery motions occurred during the August 12 suppression hearing, when the following transpired:
 "[APPELLANT'S COUNSEL]: I filed a motion for specific discovery, your Honor, for the videotaped confessions and to verify a few things I haven't received, in addition to [various statements made by the appellant that appeared in Corporal Hunt's supplemental reports] which has come forth in this hearing that I haven't yet received. I think it will be necessary to grant a continuance. . . .
 "[PROSECUTING ATTORNEY]: And since I never gave discovery in this case, this is the first time I heard [appellant's counsel] mention things he didn't get, so I assume —
"THE COURT: Make sure he gets it all. . . ."
(R. 40-41.) The circuit judge also stated, "Y'all need to go now, today, and sit down and give him information about any confessions anywhere" (R. 46.) The court granted the appellant's August 14 motion for continuance. The trial commenced on September 17.
The appellant now contends that the circuit court erred when it received into evidence the exculpatory statements made by the appellant that appeared in Corporal Hunt's supplemental reports. When these statements were offered into evidence at trial, however, the appellant did not object, nor in any other way call the courts attention to a failure by the state to comply with the discovery orders issued during the suppression hearing. Further, the appellant did not present this issue to the trial court in his motion for new trial. In order to correctly preserve an issue for appellate review, the appellant must first afford the circuit court an opportunity to consider the issue. Jordan v. State, 574 So.2d 1024 (Ala.Cr.App. 1990);Buice v. State, 574 So.2d 55 (Ala.Cr.App. 1990).
The appellant's discovery motion was granted. Further, the trial judge subsequently granted a continuance to facilitate the appellant's discovery and to allow the appellant to prepare for trial accordingly. Thus, there is no adverse ruling for this court to review. Owens v. State, 597 So.2d 734
(Ala.Cr.App. 1992); Gibson v. State, 555 So.2d 784 (Ala.Cr.App. 1989).
 V
Finally, the appellant contends that the circuit court failed to follow the Habitual Felony Offender Act because he was not given notice that he was to be sentenced as a habitual offender and because the state failed to prove any prior convictions. The Habitual Felony Offender Act (HFOA), § 13A-5-9, Code of Alabama 1975, provides:
 "(a) In all cases when it is shown that a criminal defendant has been previously convicted of any felony and after such conviction has committed another felony, he must be punished as follows:
 "(1) On conviction of a Class C felony, he must be punished for a Class B felony;
 "(2) On conviction of a Class B felony, he must be punished for a Class A felony;
 "(3) On conviction of a Class A felony, he must be punished by imprisonment for life or for any term of not more than 99 years but not less than 15 years.
 "(b) In all cases when it is shown that a criminal defendant has been previously convicted of any two felonies and after such convictions has committed another felony, he must be punished as follows:
 "(1) On conviction of a Class C felony, he must be punished for a Class A felony;
 "(2) On conviction of a Class B felony, he must be punished by imprisonment for life or for any term of not more than 99 years but not less than 15 years; *Page 527 
 "(3) On conviction of a Class A felony, he must be punished by imprisonment for life or for any term of not less than 99 years.
 "(c) In all cases when it is shown that a criminal defendant has been previously convicted of any three felonies and after such convictions has committed another felony, he must be punished as follows:
 "(1) On conviction of a Class C felony, he must be punished by imprisonment for life or for any term not more than 99 years but not less than 15 years;
 "(2) On conviction for a Class B felony, he must be punished for life in the penitentiary;
 "(3) On conviction for a Class A felony, he must be punished by imprisonment for life without parole."
(Emphasis added.)
"The word 'must,' as it is used in § 13A-5-9, leaves the court with no discretion as to whether a repeat offender is to be punished under the [habitual felony offender] statute."Watson v. State, 392 So.2d 1274, 1276 (Ala.Cr.App. 1980), writ denied, 392 So.2d 1280 (1981). See also Ex parte Chambers,522 So.2d 313 (Ala. 1987); Willis v. State, 455 So.2d 914
(Ala.Cr.App. 1983), rev'd on other grounds, 455 So.2d 917 (Ala. 1984); Hughes v. State, 443 So.2d 1382 (Ala.Cr.App. 1983).
Rule 26.6(b)(3)(ii), A.R.Crim.P. states as follows:
 "At a reasonable time prior to the hearing, the defendant shall be given notice of the prior conviction or convictions upon which the state intends to proceed."
Recently, the Alabama Supreme Court in Connolly v. State,602 So.2d 452 (Ala. 1992), stated that a defendant must be given notice of the intention of the state to proceed under the HFOA and notice of the prior convictions that the state intends to rely on at the sentencing hearing. The Supreme Court stated:
 "To enhance a defendant's sentence under the HFOA, the State must give proper notice of its intent to do so. The State must also give the defendant proper notice of the alleged previous felony convictions that it will attempt to prove. . . ."
Connolly, 602 So.2d at 455. (Emphasis added.)
The appellate courts of Alabama are bound by the decisions of the Alabama Supreme Court. Section 12-3-16, Code of Alabama 1975, states:
 "The decisions of the supreme court shall govern the holdings and decisions of the courts of appeals, and the decisions and proceedings of such courts of appeals shall be subject to the general superintendence and control of the supreme court as provided by constitutional amendment No. 328."
Following the Supreme Court's holding that the state must give notice of its intention to proceed under the HFOAand give notice of which convictions it will attempt to prove, it would necessarily be true that notice given by the state of the prior felony convictions that it plans to prove, in and of itself, would also constitute notice of its intention to invoke the HFOA. However, mere notice of the state's intention to proceed under the HFOA will not satisfy the notice provision of Rule 26.6(b)(3)(ii) as to which convictions the state intends to use. Connolly.
It is not apparent from the record in this case whether the appellant was given notice of the state's intention to proceed under the HFOA or was given notice of the prior felony convictions that the state intended to prove. The transcript of the sentencing hearing reveals only that the appellant was given a chance to say why sentence of law should not be pronounced upon him. The judge then sentenced him to life without parole,[3] which is a lawful sentence under the HFOA if three prior felonies have been proven, according to Rule 26.6(b)(3), A.R.Crim.P; § 13A-5-9(c)(1), *Page 528 
Code of Alabama 1975. The record is silent as to the existence of any prior felony convictions.
Under the authority of Connolly, this cause must be remanded to the circuit court for a new sentencing hearing. Initially, the trial court must determine whether the appellant was given reasonable notice of the state's intention in invoke the HFOA at sentencing. Second, as in McConnell v. State, 593 So.2d 93
(Ala.Cr.App. 1991), we direct the circuit court to determine whether the appellant was given reasonable notice of the prior convictions the state proposed to present. If the court can determine that notice of both was given, "then the appellant can and should be sentenced as a habitual felony offender."593 So.2d at 94. Further, the state may use convictions other than those it originally alleged, provided that reasonable notice of the state's intent to proceed under the HFOA and notice of what convictions the state will attempt to prove at the sentencing hearing has been given each sentencing hearing. Connolly, supra.
If the circuit court determines that the state did not provide reasonable notice of the application of the HFOA and did not give reasonable notice of the prior convictions or if the convictions were not proved as provided by the Alabama Rules of Criminal Procedure, then the appellant can be sentenced only as a first-time offender. McConnell, supra. See also, May v. State, 586 So.2d 56 (Ala.Cr.App. 1991).
We affirm the conviction in this case; we remand the case for resentencing. A return shall be filed to this court within 45 days from the date of this opinion, evidencing the sentencing of the appellant in accordance with the law and the instructions stated above.
ORIGINAL OPINION WITHDRAWN; OPINION SUBSTITUTED; REMANDED WITH DIRECTIONS.
All the Judges concur.
[1] 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] The appellant cites Rule 18 of the Alabama Rules of Criminal Procedure, Temporary, in support of his argument. However, on April 21, 1992, the Alabama Supreme Court amended Rule 1.5 of the Alabama Rules of Criminal Procedure, making the new rules applicable "to all criminal proceedings, without regard to when the proceeding commenced." Thus, Rule 16, A.R.Crim.P., the equivalent of Rule 18, A.R.Crim.P.Temp., is applicable to this case.
[3] Even though the appellant failed to object to his allegedly unlawful sentence, "when a sentence is clearly illegal or is clearly not authorized by statute, the defendant does not need to object at the trial level in order to preserve that issue for appellate review." Ex parte Brannon, 547 So.2d 68, 68 (Ala. 1989); Hayes v. State, 588 So.2d 502, 506-07 (Ala.Cr.App. 1991). *Page 878